UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| CARL W. HUTTO and DIANN HARDMAN, | § § § | |
| Plaintiffs, | § § | |
| v. | § § | CIVIL ACTION NO. _____ |
| RED ROOF INNS, INC.; JP HOTEL CORP. d/b/a RED ROOF INN; PRAKASH JASON PATEL; and TERRY D. GILMORE, | § § § § § | JURY DEMANDED |
| Defendants. | § § | |

## ORIGINAL COMPLAINT

### I.  SUMMARY

1.   Plaintiffs Carl W. Hutto and DiAnn Hardman are former employees of Defendants Red Roof Inns, Inc., JP Hotel Corp., Prakash Jason Patel and Terry D. Gilmore. Plaintiff Hutto worked as a general maintenance man and Plaintiff Hardman worked as a housekeeper at the Red Roof Inn located at 8150 Esters Boulevard, Irving, Texas 75063 ("Red Roof Inn #129"). This facility was owned and/or operated by Corporate Defendants Red Roof Inns, Inc. and JP Hotel Corp. Individual Defendant Patel (president of Defendant JP Hotel Corp.), and Individual Defendant Gilmore (manager of Red Roof Inn #129), had a practice of manipulating time clock records and of under-reporting to their payroll company the hours worked by Plaintiffs during each payroll period. By so doing, Defendants routinely and deliberately failed to pay Plaintiffs at the correct rate for all hours worked over forty in a week, in violation of the overtime provisions found at Section 207 of the Fair Labor Standards Act, 29 U.S.C. § 201 et seq. ("FLSA" or the "Act"). In addition, Defendants made improper or excessive deductions from Plaintiffs' wages for rent in

violation of Section 203(m) of the Act. Defendants also failed to keep adequate and accurate records of Plaintiffs' work hours and pay in violation of Section 211(c) of the Act. Accordingly, pursuant to by Section 216(b) of the FLSA, Plaintiffs now bring this action to recover the unpaid compensation owed to them by Defendants as well as Plaintiffs' liquidated damages, costs and attorney's fees.

## II. SUBJECT MATTER JURISDICTION AND VENUE

2. This Court has jurisdiction over the subject matter of this action under 29 U.S.C. § 216(b) and 28 U.S.C. § 1331.

3. Venue is proper in the Northern District of Texas because the events forming the basis of this suit occurred in this District.

## III. PARTIES AND PERSONAL JURISDICTION

4. Plaintiff Carl W. Hutto (hereinafter, "Hutto") is an individual residing in Tarrant County, Texas. His written consent form is attached hereto as Exhibit "A."

5. Plaintiff DiAnn Hardman (hereinafter, "Hardman") is an individual residing in Tarrant County, Texas. Her written consent form is attached hereto as Exhibit "B."

6. Defendant Red Roof Inns, Inc. (hereinafter, "RRI") is a Delaware corporation with its corporate headquarters located at 7815 Walton Parkway, New Albany, Ohio 43054. It may be served through its registered agent Corporation Service Company, at 50 West Broad Street, Suite 1330, Columbus, Ohio 43215.

7. Defendant JP Hotel Corp. (hereinafter, "JPH") is a Texas corporation with its corporate headquarters located at 6168 Colfosco Drive, Frisco, Texas 75035. It may be served through its registered agent Jason Patel at 6168 Colfosco Drive, Frisco, Texas 75035, or wherever Jason Patel may be found.

8. Defendant Prakash Jason Patel (hereinafter, "Patel") is an individual residing in Collin County, Texas. He may be served at his residence at 6168 Colfosco Drive, Frisco, Texas 75035, or wherever he may be found.

9. Defendant Terry D. Gilmore (hereinafter, "Gilmore") is an individual residing in Dallas County, Texas. He may be served at 8150 Esters Boulevard, Irving, Texas 75063, or wherever he may be found.

## IV. COVERAGE

10. At all material times, Defendants RRI and JPH (collectively, the "Corporate Defendants") were employers within the meaning of 29 U.S.C. §203(d) because Defendants and their agents had the power to hire or fire Plaintiffs; to control their work schedule and their conditions of employment; and to determine their rates of pay and the method of payment.

11. Arguing in the alternative, Defendant JPH was at all material times an employer within the meaning of 29 U.S.C. §203(d), because Defendant JPH and its agents had the power to hire or fire Plaintiffs; to control their work schedule and their conditions of employment; and to determine their rates of pay and the method of payment.

12. Defendants Patel and Gilmore were employers within the meaning of 29 U.S.C. §203(d), because said Defendants had the power to hire or fire Plaintiffs; to control their work schedule and their conditions of employment; and to determine their rates of pay and the method of payment. These individuals were agents of the Corporate Defendants, and joint employers of Plaintiffs with the Corporate Defendants.

*Enterprise Coverage*

13. At all material times, Corporate Defendants RRI and JPH were an enterprise within the meaning of 29 U.S.C. §203(r)(1) because said Defendants engaged in related activities for the

common business purpose of operating a hotel/motel establishment located at 8150 Esters Boulevard, Irving, Texas 75063 under the assumed name "Red Roof Inn." This establishment was identified internally by the Corporate Defendants as "Red Roof Inn #129."

14. At all material times, the Corporate Defendants were an enterprise in commerce within the meaning of Section 3(s)(1)(A) of the FLSA because said Corporate Defendants had multiple employees engaged in commerce. 29 U.S.C. § 203(s)(1).

15. Arguing in the alternative, Defendant JPH was independently an enterprise within the meaning of 29 U.S.C. §203(r)(1), because it performed related activities for the common business purpose of operating Red Roof Inn #129 under the assumed name "Red Roof Inn."

16. Arguing in the alternative, Defendant JPH was an enterprise in commerce within the meaning of 29 U.S.C. 203(s)(1)(A) of the FLSA because it had multiple employees engaged in commerce.

17. At all material times, Defendant RRI had an annual dollar volume of sales or business done in excess of $500,000.00.

18. At all material times, Defendant JPH had an annual dollar volume of sales or business done in excess of $500,000.00.

*Individual Coverage*

19. At all material times, Plaintiff Hutto was an individual employee of Defendants who engaged in commerce or in the production of goods for commerce as contemplated by 29 U.S.C. § 207.

20. In his capacity as a maintenance man working at Red Roof Inn #129, Plaintiff Hutto provided services in a facility providing temporary accommodation for interstate travelers, including American Airline pilots and others traveling across state lines. He also purchased

4

materials and tools for Red Roof Inn #129 using a MetaBank debit card, and he operated and repaired hotel/motel equipment which had moved in interstate commerce.

21. At all material times, Plaintiff Hardman was an individual employee of Defendants who engaged in commerce or in the production of goods for commerce as contemplated by 29 U.S.C. § 207.

22. In her capacity as a housekeeper working at Red Roof Inn #129, Plaintiff Hardman provided services in a facility providing temporary accommodation for interstate travelers, including American Airline pilots and others traveling across state lines. Plaintiff Hardman also purchased housekeeping materials and supplies for Red Roof Inn #129 using a MetaBank debit card, and she operated hotel/motel equipment which had moved in interstate commerce.

*Individual Liability*

23. Defendant Patel is an individual owner of, and Defendant Gilmore is the manager for, Defendant JPH, which entity conducts business under the assumed name "Red Roof Inn" at the location of the hotel/motel facility known to the Corporate Defendants as Red Roof Inn #129. Defendants Patel and Gilmore (collectively, the "Individual Defendants") had direct control over the operations of Red Roof Inn #129. They were present on site, set and controlled Plaintiff's work schedules, managed timekeeping and payroll, and were responsible for ensuring that their employment practices complied with the FLSA. At all times relevant to this lawsuit, Individual Defendants Patel and Gilmore had the authority to hire and fire Plaintiffs, to direct and supervise their work, to sign their paychecks, and to raise or lower their compensation. These Individual Defendants in fact exercised their powers by hiring Plaintiffs, by setting their work schedules, monitoring their hours worked, by signing checks or paying them cash, and by altering Plaintiffs' time records and rate of pay in a scheme to avoid paying overtime at the rate required by law. In

so doing, Individual Defendants Patel and Gilmore acted directly or indirectly in the interest of an employer in relation to an employee, thereby subjecting themselves to individual liability under the Act. 29 U.S.C. § 203(d).

## V. FACTS

24. Defendants RRI and JPH are corporations which jointly conduct business at 8150 Esters Boulevard, Irving, Texas 75063, under the assumed name "Red Roof Inn" (a.k.a. "Red Roof Inn #129). Upon information and belief, at all times material to this suit the Corporate Defendants have been contractually engaged in a franchisor-franchisee relationship (i.e. the "Franchise Agreement"), with Defendant RRI as the franchisor and Defendant JPH as the franchisee.

25. Pursuant to the Franchise Agreement, Defendant JPH was required to send, and in fact did send, one or more persons who serve or who have served in the capacity of manager of the Red Roof Inn located at 8150 Esters Boulevard, Irving, Texas 75063 to Defendant RRI's training on management of Red Roof Inn facilities.

26. Pursuant to that same Franchise Agreement, Defendant JPH was required to send, and in fact did send, one or more of its employees to attend training on Defendant RRI's procedures on the operation of a Red Roof Inn facility.

27. Multiple times during each year of the time period material to this suit, Defendant RRI sent inspectors to the Red Roof Inn located at 8150 Esters Boulevard, Irving, Texas 75063 to inspect the facilities and its records and to assure itself that its franchisee's performance was in compliance with company standards and applicable law as required by the Franchise Agreement.

28. Individual Defendant Patel is the president and an owner of JPH and he was regularly present on site and directly involved in the operation of Red Roof Inn #129.

6

29. Individual Defendant Gilmore is the manager of Red Roof Inn #129, and he was regularly present on site and directly involved in the operation of said establishment.

*Hutto's hiring and duties.*

30. On or about September 23, 2016, Defendants hired Plaintiff Hutto as a maintenance man for Red Roof Inn #129. As part of the hiring process, Defendants had Plaintiff Hutto fill out an RRI "Application For Employment" and an RRI "Authorization For Background Check." He was hired at an initial rate of ten dollars per hour ($10.00/hr.), and his duties generally comprised property maintenance to include painting, plumbing, electrical work and other repairs as needed. He also moved bins of trash from inside the property to the dumpster on a daily basis, and he unloaded United Parcel Service (UPS), Sherwin Williams, and other vendor trucks delivering supplies on approximately five out of the seven days in his workweek. On occasion, Defendant Patel or Defendant Gilmore would send him to buy equipment or supplies for the Property. Plaintiff Hutto would go buy these materials from Home Depot or other supply stores and typically would pay for them using his own cash or his MetaBank debit card. He would later be reimbursed by Defendants Patel or Gilmore with cash from the company safe, the cash drawer, or Defendant Patel's pocket.

*Hutto's regular work schedule.*

31. Plaintiff Hutto worked for Defendants seven days per week. His usual punch-in time was around 7:00 a.m., although he occasionally punched in closer to 8:00 a.m. His hands are large and callused, and as a result he was unable to use Defendants' fingerprint scanner. Instead, he punched in (and out) using a birthdate code. Plaintiff Hutto did not take thirty-minute lunch breaks. His typical lunch routine was to grab a cup of coffee or a sandwich from his room at Red Roof Inn #129 and to immediately resume working. His work on-the-clock typically continued

7

until some time period between 6:00 p.m. and 8:00 p.m. At that point, Plaintiff Hutto would clock out, but his workday was not over.

*Hutto's off-the-clock work.*

32. Hotel/motel facilities, by definition, provide overnight lodging. Demands for service and maintenance do not stop in the evening. In fact, they sometimes increase. Accordingly, after clocking out, Plaintiff Hutto would continue to receive calls from Defendant Gilmore or from the front desk personnel of Red Roof Inn #129 requesting assistance and repairs throughout the night. On some occasions, the calls continued without cease from his evening punch-out until around 2:00 a.m. the following morning. Most nights involved two to four additional hours of work. On occasion, there were nights where Plaintiff Hutto only received one or two calls and where he worked only an additional 30 minutes or so. On average, however, Plaintiff Hutto worked at least 1.5 off-the-clock hours per night. He was not able to clock in for any of this time, because Defendants set the time clock so that it would accept only one clock-in and clock-out per day. Defendants were aware of the work performed by Plaintiff Hutto, however, both because Defendant Gilmore and Defendants' front desk personnel requested the work in the first instance, and also because each morning Plaintiff Hutto provided a report to Defendant Gilmore summarizing the maintenance performed the night before. Nevertheless, Defendants failed to report Plaintiff Hutto's evening work to Defendants' payroll service provider.

33. The off-the-clock work described immediately above was a constant feature of Plaintiff Hutto's employment except with respect to a three-month period from early March 2018 through late May 2018, when Plaintiff Hutto resided elsewhere. The off-the-clock work resumed in early June 2018 when Plaintiff Hutto resumed living at Red Roof Inn #129 and continued until the end of his employment on or about July 25, 2018.

8

34. As mentioned previously, and as will be described in greater detail below, Defendants Patel and Gilmore routinely shorted Plaintiff Hutto on payment for his hours worked. On or about July 24, 2018, after once again being shorted on his paycheck for a payroll period in which Plaintiff Hutto had worked in excess of 180 hours and was paid only $1,000.00, he contacted Defendant Gilmore by text message to complain. Defendant Gilmore responded by text and agreed to pay an additional sum, and he left an envelope containing $400.00 for Plaintiff Hutto at the front desk. As this was far short of what was owed, Plaintiff Hutto terminated his employment at Red Roof Inn #129.

*Hiring of Hardman.*

35. In early October 2016, within a week or two after Defendants hired Plaintiff Hutto, Defendants also hired Hutto's wife, Plaintiff Hardman, to work at Red Roof Inn #129 as a housekeeper. Defendants agreed to pay Plaintiff Hardman a piece-rate of $5.00 per room. As part of the hiring process, Plaintiff Hardman filled out an RRI "Application For Employment" and an RRI "Authorization For Background Check."

*Hardman's initial work period.*

36. From October 2016 through approximately January 2017, Plaintiff Hardman worked two to four hours per night cleaning rooms. She was paid for this work in the evening or the following morning with cash from the office safe which was handed to her by Defendant Gilmore. Plaintiff Hardman is not asserting wage claims with respect to this period.

*Hardman's door-painting.*

37. Beginning around early February 2017, Plaintiff Hardman began picking up shifts during the day for late, absent or terminated housekeepers in addition to her evening work. After approximately two weeks of erratic scheduling, Plaintiff Hardman complained about the

9

inconsistent work, and Defendants reassigned her to painting the Property's exterior doors. She painted approximately 8 doors per day for approximately three weeks. Each door would take a bit more than one hour of work, as it involved sanding the door, filling in holes with Bondo Wood Filler, taping around the door, and then painting, all of which was periodically interrupted by maids and customers. In total, Plaintiff Hardman averaged eight to nine hours of painting work per day, seven days per week, and she was paid $12.50 per door. She continued to perform evening cleaning work during this period at the piece rate of $5.00 per room, three to four rooms per night on average, and an average time worked of 1.5 hours per night. Plaintiff Hardman worked 78 to 79 hours per week during this three-week period.

*Hardman added to regular housekeeping schedule*

38. At the conclusion of the door-painting period, around early March 2017, Defendants gave Plaintiff Hardman a permanent place on the day schedule. Defendants assigned housekeepers (including Plaintiff Hardman) identifying numbers and gave them a "Room List" identifying their assigned rooms for cleaning that day. Plaintiff Hardman performed her own assigned work and occasionally the work of others in addition. From approximately early March 2017 forward, Plaintiff Hardman was cleaning rooms on the day shift for approximately 11.0 hours per day for an average of six days per week. She also continued to clean rooms in the evening, anywhere from one to four hours, but on average for an additional 1.5 hours per night. During this period, Defendant Gilmore continued to pay Plaintiff Hardman in cash from the office safe at a rate of $5.00 per room. She was working approximately 75 hours per week on average.

39. In or around April 2017, Defendant Gilmore informed Plaintiff Hardman that his accountant could no longer hide the cash payments he was giving to Plaintiff Hardman, and that he would need to move her onto the formal payroll. Defendant Gilmore then had Plaintiff Hardman

10

fill out a second RRI "Application For Employment" and a second RRI "Authorization For Background Check." From that point forward, Plaintiff Hardman was paid via check signed by Defendant Patel.

*Hardman performs evening inspection/cleaning work in addition to other duties.*

40. In or around October 2017, Plaintiff Hardman began inspecting and cleaning vacant units in the evening in addition to her daily duties. Prior to that time, the evening inspection had been performed by Mark and "Purdie" Patel, a couple related to Prakash Jason Patel and indebted to him to the tune of some $30,000.00 for immigration-related assistance. Red Roof Inn #129 has approximately 156 rooms, and the couple had been cleaning 40-60 of those rooms per day at $1.50 per person per room and had been inspecting the vacant units (and cleaning them if needed) for an additional $10.00 per day. The Patels eventually balked at doing so much work for so little money, at which point Defendant Gilmore asked Plaintiff Hardman to take over the inspection work at a rate of $15.00 per day. Plaintiff Hardman agreed to do the inspection work. She received the $15.00 per day for the inspection work but was not paid anything additional for inspection-related room cleaning performed in the evening. She continued to work 6 days per week on average, approximately 75 hours per week.

*Hardman's day inspections and night cleanings.*

41. Beginning May 28, 2018, Defendants changed Plaintiff Hardman's duties. They paid her $85.00 per day to do room inspection work during the day, with some additional room cleaning duties in the evening. She inspected rooms throughout the day, and she cleaned rooms or assisted other housekeepers with room cleaning as needed. Plaintiff Hardman averaged approximately 46 hours per week from May 28, 2018 through June 17, 2018. She worked

11

approximately 30 hours during the week of June 18, 2018 through June 24, 2018. On June 25, 2018, Plaintiff Hardman terminated her employment with Defendants.

*Defendants' improper rent deduction from wages.*

42.     Although Defendants benefited from Plaintiffs' work and had recourse to Plaintiff Hutto's skills for hotel/motel customer emergency requests 24 hours per day (with the exception of a three-month period in Spring 2018 when Plaintiff Hutto resided elsewhere and was not performing night work), they did not furnish him and Plaintiff Hardman with a free room. For the period from October 2016 through April 17, 2017, Defendants stated that they were deducting 45 hours per two-week pay period from Plaintiff Hutto's paycheck for rent. For the period from April 17, 2017 through September 4, 2017, Defendants stated that they were deducting 50 hours per two-week pay period from Plaintiff Hutto's paycheck for rent. Since the hours deducted were overtime hours that should have been payable to Plaintiff Hutto at a rate of $15 per hour, Defendants were in effect charging Plaintiffs rent of $675.00 per two-week pay period in the first time frame discussed above, and $750.00 per two-week pay period in the second, sums that included profit to Defendants and that grossly exceeded the "fair value" of the lodging as that term is provided for by 29 U.S.C. §203(m).

43.     Beginning on or around September 4, 2017, Plaintiffs insisted on paying cash for their rent in order to have better visibility into what they were being charged. From that point through approximately March 7, 2018, Defendants rented a room to Plaintiffs at the $40.00 per night rate charged to commercial airline personnel for a "Superior King" room. The amounts charged included profit to Defendants and exceeded the "fair value" of the lodging as provided for by 29 U.S.C. §203(m). Moreover, the "Superior King" room rented to Plaintiffs had a ceiling leak above the toilet, necessitating the constant use of an umbrella in order to use the facilities.

Defendants refused to allow Plaintiff Hutto to tear out the ceiling to access and repair the leak until <u>after</u> Plaintiffs advised that they were moving out on or about March 7, 2018, at which point Defendants authorized Plaintiff Hutto to tear out the ceiling and to perform the repair in order to prepare the room for new customers.

44. Plaintiff Hutto, alone, moved back to Red Roof Inn #129 on or about the beginning of June 2018, and he resided there until the termination of his employment on July 25, 2018. He was staying in a room that was the smallest available room size at the facility, a "Regular King." Defendant Gilmore advised Plaintiff Hutto that the sum of $600.00 per pay period was being deducted from his pay for rent. That sum included profit to Defendants and exceeded the "fair value" of the lodging as provided for by 29 U.S.C. §203(m).

*Overtime Violations:*

*A. Defendants fail to pay overtime to Hutto
and manipulate his time clock records.*

*Manipulation # 1*

45. As described above in paragraphs 31 and 32 of this Complaint, Plaintiff Hutto worked for Defendants approximately 12.5 hours per day, 7 days per week. As previously mentioned, however, Defendants neither recorded nor paid for Plaintiff Hutto's work in the evenings, and in addition they automatically deducted 30 minutes from Plaintiff's Hutto's on-the-clock work for a bona fide lunch period he did not take. With respect to the hours that Defendants actually did pay for, time was paid at a straight time rate. Overtime was not paid.

*Manipulation # 2*

46. Beginning on or about September 4, 2017, Defendants varied their scheme to avoid paying overtime. Although they continued the prior practice of automatically deducting lunch breaks that Plaintiff Hutto did not take, and of failing to record and report his evening hours worked

to the payroll service provider, they also began manipulating Plaintiff Hutto's time records to show him working approximately 80 hours every pay period. Since Plaintiff Hutto was routinely working 175 hours or more per pay period—and in order to prevent him from quitting on the spot—Defendants began to vary his reported pay rate each pay period so that his total compensation would approximate his usual $11.00 per hour rate (increased in April 2017 from his initial rate of $10.00 per hour at the time of hiring) for the bulk of his hours worked (albeit excluding the hours Defendants were not in the habit of recording anyway, such as his evening hours and his deducted meal break time). For example, on September 5, 2017, Defendants paid Plaintiff Hutto for an alleged 78.9 hours worked at a rate of $19.00 per hour. On September 19, 2017, Defendants paid Plaintiff Hutto for an alleged 79.5 hours worked at a rate of $20.00 per hour. On October 3, 2017, Defendants paid Plaintiff Hutto for an alleged 80.0 hours of work at a rate of $17.60. This scheme continued through the pay period ending on January 8, 2018.

*Manipulation # 3*

47.     On January 23, 2018, Defendants stopped reporting the pay rate and the hours worked altogether. Instead, they simply reported the sum paid to Plaintiff Hutto in each pay period. In this particular pay period, the sum paid was $880.00. If one divides that gross sum by his actual contemporaneous hourly rate of $11.00 per hour, the calculation yields exactly 80 hours being paid at a straight time rate, when in fact Plaintiff Hutto was working more than double that number of hours.

*Manipulation # 4*

48.     Although, based upon the records available to Plaintiff, Defendants continued their practice of no longer reporting any pay rate or hours worked through the end of Plaintiff Hutto's employment, beginning with the very next pay period it appears that they stopped their practice of

massaging his hours worked to approximate 80 hours in a pay period. Plaintiff Hutto was informed on or about February 5, 2018 that he was receiving a $2.00 per hour raise, bringing his (unrecorded) hourly rate to $13.00 per hour. If one divides the $1,813.50 he was paid on February 6, 2018 by the new $13.00 per hour rate, it appears that Defendants were paying Plaintiff Hutto at a straight time rate for 139.5 hours in that pay period. However, setting aside for the moment the overtime violation, this shorted Plaintiff Hutto approximately 35 hours of pay at a straight time rate in that pay period. Defendants continued to short Plaintiff Hutto's pay in this manner through the end of his employment in late July 2018.

*Overtime Violations:*

*B. Defendants fail to pay overtime to Hardman.*

49. Throughout her employment, Defendants paid Plaintiff Hardman at a piece rate, and failed to track her hours. Although she worked in excess of 40 hours in all of the weeks from mid-to-late February 2017 through June 17, 2018, Defendants never paid her the overtime premium for her hours above 40 worked in a week.

## VI. CAUSES OF ACTION

### A. Violation of 29 U.S.C. § 203(m)(1)

50. Plaintiffs incorporate all allegations contained in the foregoing paragraphs.

51. Defendants deducted sums for lodging from Plaintiff Hutto's wages that exceeded the reasonable cost and fair value of said lodging, in violation of 29 U.S.C. § 203(m)(1). Defendants' improper and excessive deductions from Plaintiff Hutto's wages were deliberate and willful violations of the Act.

### B. Violation of 29 U.S.C. § 207

52. Plaintiffs incorporate all allegations contained in the foregoing paragraphs.

53. Defendants' practice of not paying Plaintiffs at a rate of one and one-half times Plaintiffs' regular rate for all of their overtime hours worked violated the FLSA. 29 U.S.C. § 207.

54. None of the exemptions provided by the FLSA regulating the duty of employers to pay overtime at a rate not less than one and one-half times the regular rate at which their employees are employed is applicable to Defendants or to Plaintiffs. Defendants' failure to pay overtime was a deliberate and willful violation of the Act.

### C. Violation of 29 U.S.C. § 211(c)

55. Plaintiffs incorporate all allegations contained in the foregoing paragraphs.

56. Defendants failed to keep adequate and accurate records of Plaintiffs' work hours and pay in violation of the FLSA. 29 U.S.C. § 211(c). Defendants' failure to keep such records was a deliberate and willful violation of the Act.

57. Federal law mandates that an employer is required to keep for three (3) years all payroll records and other records containing, among other things, the following information:

   A.  The time of day and day of week on which the employees' work week begins;

   B.  The regular hourly rate of pay for any workweek in which overtime compensation is due under Section 7(a) of the FLSA;

   C.  An explanation of the basis of pay by indicating the monetary amount paid on a per hour, per day, per week, or other basis;

   D.  The amount and nature of each payment which, pursuant to Section 7(e) of the FLSA, is excluded from the "regular rate";

   E.  The hours worked each workday and total hours worked each workweek;

   F.  The total daily or weekly straight time earnings or wages due for hours worked during the workday or workweek, exclusive of premium overtime compensation;

   G.  The total premium for overtime hours. This amount excludes the straight-time earnings for overtime hours recorded under this Section;

      H.      The total additions to or deductions from wages paid each pay period including employee purchase orders or wage assignments;

      I.      The dates, amounts, and nature of the items which make up the total additions and deductions;

      J.      The total wages paid each pay period; and

      K.      The date of payment and the pay period covered by the payment.

29. C.F.R. §§ 516.2 and 516.5.

58.    Because Defendants have failed to maintain accurate pay records with respect to Plaintiffs, Plaintiffs can meet their evidentiary burden under the FLSA by proving that they, in fact, performed work for which they were improperly compensated, and may do so by producing sufficient evidence to show the amount and extent of the work "as a matter of a just and reasonable inference." See, e.g., Anderson v. Mt. Clemens Pottery Co., 328 U.S. 680, 687 (1946).

## VII.  DAMAGES SOUGHT

59.    Plaintiffs seek compensation for all of their overtime hours worked which were not paid to them at one-and-one-half times their regular rate of pay.

60.    Plaintiffs seek to recover their unpaid gap time in connection with the unpaid overtime hours.

61.    Plaintiff Hutto is also entitled to recover all improper and unauthorized deductions taken from his paychecks by Defendants for rent, as well as all the excessive and improper amounts charged by Defendants for rent and paid to them in cash.

62.    Plaintiffs are further entitled to an amount equal to all of the above sums as liquidated damages.

63.    Plaintiffs are also entitled to recover their attorney's fees and costs as provided for by the FLSA.

## VIII.  **PRAYER**

For the foregoing reasons, Plaintiffs respectfully request that the Court enter judgment in their favor and against the Defendants, and that the Court find said Defendants jointly and severally liable to Plaintiffs for the following relief:

a. Unpaid wages which accrued as a result of Defendants' failure to pay Plaintiffs for all hours worked over forty in a workweek at a rate of one-and-one-half times the applicable regular rate;

b. Unpaid gap time which accrued in connection with the unpaid overtime;

c. All rent money deducted by Defendants from Plaintiff Hutto's wages;

d. An amount equal to the sum of the foregoing as liquidated damages for Defendants' violation of the overtime provisions of the FLSA, as permitted by said Act;

e. Reasonable attorney's fees, costs and expenses of this action as provided for by the FLSA; and

f. Such other and further relief to which Plaintiffs may be entitled, at law or in equity.

Respectfully submitted,

/s/ *Alex Mabry*
Alex Mabry
State Bar No.  00792043
MABRY LAW FIRM, PLLC
10320 Sommerville Avenue
Houston, Texas 77041
Telephone:  832-350-8335
Facsimile:  832-831-2460
*Attorney-in-Charge for Plaintiffs*

J. Derek Braziel
State Bar No. 00793380
LEE & BRAZIEL, LLP
1801 N. Lamar St., Ste. 325
Dallas, Texas 75202
Telephone:  214-749-1400
Facsimile:  214-749-1010
*Local Counsel for Plaintiffs*